**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-2808

———————

DONALD WHITE,
On behalf of himself and all others similarly situated

v.

SUNOCO, INC.,
                                    Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:15-cv-04595)
District Judge:  Honorable Paul S. Diamond

———————

Argued: January 24, 2017

Before:  CHAGARES, RESTREPO, and ROTH, <u>Circuit
Judges</u>.

(Opinion Filed:  September 5, 2017)

Seamus C. Duffy (ARGUED)
Kathryn E. Deal
Meredith C. Slawe
Katherine L. Villanueva
Drinker Biddle & Reath
18th & Cherry Streets
One Logan Square, Suite 2000
Philadelphia, PA 19103

*Counsel for Appellant*

David J. Stanoch (ARGUED)
Richard M. Golomb
Ruben Honik
Kenneth J. Grunfeld
Golomb & Honik
1515 Market Street
Suite 1100
Philadelphia, PA 19102

*Counsel for Appellee*

_____

OPINION

_____

CHAGARES, <u>Circuit Judge</u>.

Sunoco, Inc. appeals from the District Court's denial of its motion to compel arbitration, arguing that Donald White, who brought this lawsuit against Sunoco alleging fraud on behalf of a putative class, must arbitrate his claims pursuant to

a credit card agreement that White signed with a third party who is not named in the lawsuit. At issue in this appeal is whether Sunoco, a non-signatory to the credit card agreement and who is not mentioned in the agreement, can compel White to arbitrate. After examining the relevant state law and applying it to the facts here, we will affirm the District Court's judgment.

I.

Appellant Sunoco is a Pennsylvania corporation that markets and sells gasoline through approximately 4,900 retail operations in 26 states. This lawsuit involves the "Sunoco Rewards Program," which Sunoco advertised through various promotional materials. The Sunoco Rewards Program offered customers who buy gas at Sunoco locations using a Citibank-issued credit card (the "Sunoco Rewards Card") a 5-cent per gallon discount either at the pump or on their monthly billing statements. The promotional materials included a "Terms and Conditions of Offer" sheet, indicating that Citibank, N.A. is the issuer of the Sunoco Rewards Card. Joint Appendix ("J.A.") 45, 52. They also stated that approval for the card was dependent on meeting Citibank's creditworthiness criteria and that by applying for the card, the applicant authorized Citibank to "share with Sunoco® and its affiliates experiential and transactional information regarding your activity with us." J.A. 52. Finally, the promotion explained, "When you become a cardmember, you will receive the full Sunoco Rewards Card Program Terms and Conditions, which may change at any time for any reason upon thirty (30) days prior written notice." Id. Although Sunoco and White disagree as to whether Sunoco and Citibank jointly marketed the credit card, it is undisputed

3

that Sunoco was not a corporate affiliate of and had no ownership interest in Citibank and vice versa.

Appellant White is a Florida resident who applied for and obtained a Sunoco Rewards Card from Citibank in 2013. He made fuel purchases with the card at various Sunoco-branded gas station locations. White alleges that "[c]ontrary to its clear and express representations, Sunoco does ***not*** apply a 5¢/gallon discount on all fuel purchases made by cardholders at every Sunoco location. Sunoco omits this material information to induce customers to sign-up for the Sunoco Rewards Credit Card so they frequent Sunoco locations." J.A. 31. White avers that but for the representations regarding the 5-cent per gallon discount, he "would not have become [a] Sunoco Credit Card cardholder[] and/or would have purchased gasoline at cheaper prices and/or elsewhere." J.A. 37. He brings claims of fraud and fraudulent inducement, negligent misrepresentation, unjust enrichment, and violation of the Florida Deceptive and Unfair Trade Practices Act. White's claims are against Sunoco only, and he alleges no misconduct by Citibank.[1]

---

[1] Before bringing this action, White communicated with the Citibank customer service department several times regarding the status of fuel discount credits that he claims he was entitled to but did not receive. White alleges that on several occasions, Citibank told him that "[u]nfortunately, not all stations honor the discount as they are independently owned and operated." J.A. 252; see also J.A. 31. White acknowledges that Citibank did credit his account to some extent after he complained.

4

White's Sunoco Rewards Card is governed by a Card Agreement, which he received when he first obtained the card from Citibank and again when he requested additional copies of the agreement from Citibank on April 30, 2014 and June 1, 2015. The Card Agreement explicitly states that "we, us, and our mean Citibank, N.A., the issuer of your account" and that "you, your, and yours mean the person who applied to open this account." J.A. 88.

It is undisputed that Sunoco is not a signatory to the Card Agreement, to which White and Citibank are the only parties. The Card Agreement does not mention the word "Sunoco"; it also makes no mention of the 5-cent per gallon discount. However, the account statements mailed to White bear the Sunoco logo and include e-mail and mailing information for Sunoco. The Card Agreement also contains a "Governing Law and Enforcing Our Rights" section that states that the "terms and enforcement" of the agreement are governed by "[f]ederal law and the law of South Dakota, where [Citibank is] located." J.A. 92.

Sunoco filed a motion to compel arbitration based on the arbitration clause contained in the Card Agreement. The arbitration clause provides in relevant part,

> ***PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO INITIATE OR PARTICIPATE IN A CLASS**

5

**ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES.**

Agreement to Arbitrate: Either you or we may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between you and us (called "Claims").

J.A. 91. The arbitration clause also defined the claims that are subject to arbitration as those "relating to your account, a prior related account, or our relationship . . . including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision." Id. The provision adds that relevant claims are subject to arbitration "no matter what legal theory they are based on or what remedy . . . they seek." Id. Finally, a paragraph titled "Whose Claims are subject to arbitration?" states, "[n]ot only ours and yours, but also claims made by or against anyone connected with us or you or claiming through us or you, such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy" are subject to arbitration. Id. The arbitration provision also sets forth the steps for invoking arbitration: "At any time you or we may ask an appropriate court to compel arbitration of Claims, or to stay the litigation of Claims pending arbitration, even if such

6

Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered."[2] Id.

The District Court denied Sunoco's motion to compel arbitration. The court began its analysis by noting that "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract" and that such principles apply to arbitration agreements. J.A. 11 (quoting Griswold v. Coventry First LLC, 762 F.3d 264, 271 (3d Cir. 2014)). It determined that it would apply Third Circuit authority on compelling arbitration, explaining that neither party raised choice-of-law issues, and that it believed the outcome would be the same regardless of which law the court applied.

Examining the arbitration provision itself, the District Court observed that there was no dispute as to the validity of the provision and that the provision could only be enforced by signatories to it unless contract, agency, or estoppel principles dictated otherwise. The District Court examined all three and determined that none applied. It concluded that as to contract and agency law, Sunoco was not a third-party beneficiary of the Cardholder Agreement and its arbitration provision, and that Sunoco was not an agent, owner, or subsidiary of Citibank or vice versa. As to estoppel, the District Court concluded that the two-part "alternative estoppel" test discussed in E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187 (3d Cir. 2001), was not

---

[2] Citibank registered the arbitration clause of this agreement with the American Arbitration Association as the "Citibank Cards Standard Arbitration Agreement." J.A. 338–41.

7

met because 1) there was no close relationship between Sunoco and Citibank, and 2) the claims alleged against Sunoco did not relate to the terms or obligations in the Cardholder Agreement. Finally, the District Court rejected Sunoco's argument that because White had benefitted from the Cardholder Agreement, he should be estopped from bypassing its arbitration clause in this suit. The District Court reasoned that because a dispute that arises under the Cardholder Agreement is distinct from any dispute arising from a separate agreement with Sunoco, the estoppel principle does not apply to White.

Sunoco timely appealed.

II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(d). Our appellate jurisdiction over the District Court's denial of Sunoco's motion to compel arbitration derives from 28 U.S.C. § 1291 and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a)(1)(B). See Griswold, 762 F.3d at 268. "We exercise plenary review over the District Court's order on a motion to compel arbitration." Flintkote Co. v. Aviva PLC, 769 F.3d 215, 219 (3d Cir. 2014). We use the standard for summary judgment under Federal Rule of Civil Procedure 56(a) when reviewing the underlying motion "because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." Id. (quoting Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 528 (3d Cir. 2009)). Thus, a motion to compel arbitration should only be granted if there is no genuine dispute as to any material fact and, after viewing facts and drawing inferences in favor of the

8

non-moving party, the party moving to compel is entitled to judgment as a matter of law. Id. We note that under the FAA, "the presumption of arbitrability applies only where an arbitration agreement is ambiguous about whether it covers the dispute at hand. Otherwise, the plain language of the contract holds." CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 173 (3d Cir. 2014) (citation omitted).

III.

The key issue in this case is whether Sunoco, as a non-signatory to the Card Agreement and its arbitration clause, can compel White to arbitrate. The Supreme Court explained in Arthur Andersen LLP v. Carlisle that "'traditional principles' of state law allow a contract to be enforced by or against nonparties through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" 556 U.S. 624, 631 (2009) (quoting 21 R. Lord, Williston on Contracts § 57:19 (4th ed. 2001)); see also Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp., 748 F.3d 249, 261–62 (5th Cir. 2014) ("[P]rior decisions allowing non-signatories to compel arbitration based on federal common law, rather than state contract law . . . have been modified to conform with Arthur Andersen.").

Sunoco argues that equitable estoppel prevents White from refusing arbitration against it as a non-signatory.[3] The Arthur Andersen Court held that a non-party to an arbitration agreement may invoke section 3 of the FAA for a stay in

---

[3] Sunoco does not challenge the District Court's conclusion that third-party beneficiary theory and agency theory were invalid bases for Sunoco to compel White to arbitrate.

9

federal court if the relevant <u>state law</u> allows a non-signatory to enforce the arbitration agreement against a signatory.  556 U.S. at 632.[4]

---

[4] The parties appear to rely on <u>DuPont</u>, 269 F.3d 187, for a federal rule of equitable or "alternative" estoppel that binds a signatory to arbitrate against its will with a non-signatory.  <u>See</u> White Br. 24; Sunoco Br. 30; J.A. 17 (citing <u>DuPont</u> for the principle that, "Under the 'alternative estoppel' theory, a non-signatory may seek enforcement [of an arbitration clause against a non-signatory] when it can show: 1) there is a close relationship between it and a signatory; and 2) the alleged wrongs are related to a non-signatory's contractual obligations and duties.").  This reliance is ill-placed, as we did not adopt a rule regarding alternative estoppel in <u>DuPont</u>.  We decline to do so here because the Supreme Court in <u>Arthur Andersen</u> has rejected the analysis referenced in <u>DuPont</u>, which rested on federal law.  In <u>DuPont</u>, we had no occasion to adopt or reject a standard, but merely observed that other Courts of Appeals have employed an "alternative estoppel" theory when "a non-signatory voluntarily pierces its own veil to arbitrate claims against a signatory that are derivative of its corporate-subsidy's claims against the same signatory."  <u>DuPont</u>, 269 F.3d at 201 ("Appellants recognize that these cases bind a <u>signatory</u>[,] not a <u>non-signatory</u> to arbitration, but argue that this is a distinction without a difference.  They are wrong.").  We reinforced our observation about alternative estoppel theory in <u>Griswold</u> before concluding that such a theory is "inapplicable because our case involves a signatory . . . attempting to bind a nonsignatory . . . to the arbitration clause, rather than the inverse."  762 F.3d at 272.

To choose which state law will apply, "a federal court sitting in diversity must apply the choice-of-law rules of the forum state." LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). The forum state is Pennsylvania because the action was brought in the Eastern District of Pennsylvania. However, neither Sunoco nor White argued in their briefs which state's law regarding equitable estoppel should apply under Pennsylvania choice-of-law provisions. At oral argument, they did agree that Pennsylvania law does not apply.[5] Sunoco's attorney took the position that South Dakota law applies, while White's attorney stated that Florida law applies.[6] Oral Arg. Tr. 11:40–45; 23:10–26. Under

---

[5] The equitable estoppel rule in Pennsylvania is essentially the same as the test described in DuPont: "'non-signatories to an arbitration agreement can enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties' . . . [and if] claims against [the non-signatory] are inextricably entwined with the Contract." Elwyn v. DeLuca, 48 A.3d 457, 463 (Pa. Super. 2012) (quoting Dodds v. Pulte Home Corp., 909 A.2d 348, 351 (Pa. Super. 2006)). Even under Pennsylvania law, Sunoco's argument would still fail for substantially the same reasons the District Court advanced.

[6] While the Card Agreement's choice-of-law clause requires that the terms of the agreement itself be governed by South Dakota law, it is not immediately obvious whether the issue of equitable estoppel would be determined by that clause, especially since Citibank — which drafted the choice-of-law clause and is located in South Dakota — is not party to this dispute.

11

Pennsylvania's choice-of-law analysis, we examine whether "the laws of the two jurisdictions would produce the same result on the particular issue presented." Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006). If the results would be the same, there is no actual conflict and we "should avoid the choice-of-law question." Id. We thus examine whether the laws of Florida and South Dakota regarding equitable estoppel would produce the same result in this case. We conclude that they do.

Under South Dakota law, a signatory can be forced to arbitrate against a non-signatory under principles of equitable estoppel in either of two circumstances. The first is when "all the claims against the nonsignatory defendants are based on alleged substantially interdependent and concerted misconduct by both the nonsignatories and one or more of the signatories to the contract." Rossi Fine Jewelers, Inc. v. Gunderson, 648 N.W.2d 812, 815 (S.D. 2002) (citing MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999)). The reasoning behind this rule is that plaintiffs should not be able to "avoid the arbitration for which [they] had contracted simply by adding a nonsignatory defendant." Id. (alteration in original) (quoting Cosmotek Mumessillik Ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc., 942 F. Supp. 757, 759 (D. Conn. 1996)). Second, a signatory can also be compelled to arbitrate against a non-signatory under South Dakota law when it asserts "claims arising out of agreements against nonsignatories to those agreements without allowing those defendants also to invoke the arbitration clause contained in the agreements." Id. (alterations omitted) (quoting A.L. Williams & Assocs., Inc. v. McMahon, 697 F. Supp. 488, 494 (N.D. Ga. 1988)); see also MS Dealer, 177 F.3d at 947. In other words, a plaintiff-signatory cannot have his cake (use the agreement against the

12

non-signatory) and eat it too (avoid enforcement of the arbitration clause within the agreement).

Although the Florida Supreme Court has not opined on equitable estoppel in the arbitration enforcement context, we "predict how it would rule if faced with the issue." Spence v. ESAB Grp., Inc., 623 F.3d 212, 216 (3d Cir. 2010). We look to "'decisions of intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that addressed the issue,' as well as to 'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" Id. at 216–17 (quoting Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008)). We are convinced that the Florida Supreme Court would adopt the same rules as South Dakota, as three of the five intermediate state appellate courts in Florida have had occasion to review the issue and adopted the same rules. See Heller v. Blue Aerospace, LLC, 112 So. 3d 635, 637 (Fla. 4th Dist. Ct. App. 2013); Perdido Key Island Resort Dev., L.L.P. v. Regions Bank, 102 So. 3d 1, 6 (Fla. 1st Dist. Ct. App. 2012); Armas v. Prudential Sec., Inc., 842 So. 2d 210, 212 (Fla. 3d Dist. Ct. App. 2003).

A non-signatory may enforce an arbitration clause against a signatory under Florida law in either of two circumstances. First, "[e]quitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of concerted conduct by both the non-signatory and one or more of the signatories to the contract." Armas, 842 So. 2d at 212 (adopting the rule set forth in MS Dealer, 177 F.3d at 947, as the South Dakota Supreme Court had done); see also Perdido, 102 So. 3d at 6; Heller, 112 So. 3d

13

at 637. Second, a plaintiff may be "equitably estopped from avoiding arbitration with [a non-signatory defendant] when the claims stem from the same contractual obligation as [the plaintiff] is relying on . . . ." Armas, 842 So. 2d at 212. The rationale behind this rule is to "prevent a plaintiff from relying on a contract when it works to his advantage and repudiating it when it works to his disadvantage by requiring arbitration." Id. (citing In re Humana Inc. Managed Care Litig., 285 F.3d 971 (11th Cir. 2002)).

To summarize: both South Dakota and Florida courts would apply the doctrine of equitable estoppel to prevent a signatory from avoiding arbitration against a non-signatory in two circumstances. First, if a plaintiff-signatory alleges concerted conduct on the part of both the non-signatory and another signatory, that plaintiff may be equitably estopped from avoiding arbitration with the non-signatory. Second, if a plaintiff-signatory asserts a claim against a defendant based on an agreement, that plaintiff may be equitably estopped from avoiding arbitration on the basis that the defendant was not a signatory to that same agreement. Neither circumstance is applicable in this case.

We hold that White cannot be forced to arbitrate under principles of equitable estoppel under either South Dakota or Florida law. First, there is no alleged "concerted conduct" or misconduct on the part of Sunoco and Citibank. See Armas, 842 So. 2d at 212; Rossi, 648 N.W.2d at 815. While Sunoco contends that White strategically withheld allegations against Citibank, and that the "[p]laintiff artfully pleaded his claim to assert a fraudulent inducement theory against Sunoco alone" in order to connect the claims against Sunoco to the Cardholder Agreement, Sunoco Br. 34, 43–45, such assertions are

14

unfounded. We decline to speculate as to whether White has some related grievance against Citibank and to compel White to arbitrate based on that speculation. Further, there is nothing in the record to suggest that Citibank engaged in any concerted misconduct with Sunoco regarding the 5-cent per gallon discount. Sunoco's suggestion that Citibank's participation in approving card applications and calculating statement credits somehow constitutes concerted misconduct is also unfounded. Moreover, the fact that Citibank provided credits to White after he complained does not establish concerted misconduct between Citibank and Sunoco.

We also disagree with Sunoco's characterization of this case as akin to one alleging that the entire Card Agreement, including the arbitration agreement, is the product of fraud. See Sunoco Br. 34 (citing Merritt-Chapman & Scott Corp. v. Pa. Turnpike Comm'n, 387 F.2d 768, 771 (3d Cir. 1967)). This is not the case here because White is not launching a "general attack on a contract for fraud" or arguing that "if fraud is proven[,] the entire contract, including the arbitration provision, would fall." Merritt-Chapman, 387 F.2d at 771. White's claims against Sunoco do not impinge on the integrity of the Card Agreement between White and Citibank. Further, Sunoco cannot draw a relationship between the fraud claims and the Card Agreement where White has not alleged any.

Second, the claims that White asserts against Sunoco do not rely on any terms in the Card Agreement; White is therefore not estopped from avoiding arbitration under the arbitration clause within the Card Agreement. We know this to be true because even if the Card Agreement contained entirely different terms — for example, about the interest rate, credit limit, billing address, annual membership fee, foreign

15

transaction fees, payment schedules, credit reporting rules, or even the arbitration agreement — that would not have any bearing on the validity of White's claims against Sunoco regarding its allegedly fraudulent promise to discount 5 cents per gallon of fuel at Sunoco locations. Accordingly, White cannot be required to arbitrate based on the Card Agreement under South Dakota or Florida law.

## IV.

We also address two alternative arguments Sunoco advances which do not relate to estoppel. First, Sunoco argues that its promotional materials and the Card Agreement must be read together as one "integrated whole," and that this is a basis for compelling arbitration. Second, Sunoco argues that the arbitration clause in the Card Agreement requires that White arbitrate against "connected" entities, of which Sunoco claims it is one.

## A.

Sunoco asserts that the District Court erroneously concluded that Sunoco's promotional materials constituted a separate contract from the Card Agreement. Sunoco argues that the "the promotional materials and the Sunoco Rewards Card Agreement . . . together . . . explain and supply all of the key terms of the Sunoco Rewards Card Program," J.A. 24, and therefore form an "integrated whole" contract between White and Citibank and Sunoco. Because of this purported "integrated" contract consisting of both the Card Agreement and the promotional materials, Sunoco asserts it is entitled to invoke the arbitration clause in the Card Agreement despite not being a signatory or being mentioned at all. While we are

16

unconvinced that Sunoco's argument could ever yield a conclusion that all agreed to include Sunoco as a party to the arbitration clause, see infra, we begin by concluding that the "integrated whole" assertion itself is unfounded.

First, Sunoco's own representations contradict this position and the position taken by our dissenting colleague. Sunoco argues that the promotions were "simply an offer to receive offers, or more precisely, an invitation for Plaintiff to submit an application," Sunoco Br. 20, and acknowledges that a consumer who has been offered a promotional deal has no obligations at all.[7] It quotes the Restatement (Second) of Contracts § 26, which explains that "Advertisements of goods . . . are not ordinarily intended or understood as offers to sell." Sunoco Br. 19. In conceding that the promotions neither constituted an offer nor conferred obligations, Sunoco has also conceded that there are no terms to "integrate" with the actual contract at issue: the Card Agreement.[8]

---

[7] Sunoco's argument appears to be solely to refute the District Court's passing mention of a "separate agreement" between White and Sunoco in concluding that White should not be held to the cardholder agreement when he did not invoke any of its terms against Sunoco. J.A. 18–19. The District Court's analysis of this issue relied upon caselaw regarding estopping non-signatories from avoiding arbitration. We have already determined that under the relevant state law regarding estopping signatories, Sunoco has failed to meet the standard for invoking equitable estoppel regardless of whether there is a "separate agreement" between White and Sunoco.

[8] In order for multiple writings to constitute a single agreement between parties, the writings "must show, either on its face or

Second, Sunoco has advanced no legal basis to suggest that the promotional materials are integrated into the Card Agreement pursuant to the parol evidence rule or any other legal theory.[9] Sunoco has identified no ambiguity on the face

by reference to some other writing, the contract between the parties so that it can be understood without having recourse to parol proof." Meek v. Briggs, 86 So. 271, 272 (Fla. 1920); see also Socarras v. Claughton Hotels, Inc., 374 So. 2d 1057, 1059 (Fla. Dist. Ct. App. 1979)("[I]n order for an unsigned writing to be used to supply the essential elements of an enforceable contract, there must be some reference to that unsigned writing in the signed writing."); Baker v. Wilburn, 456 N.W.2d 304, 306 (S.D. 1990) (identifying several factors to compel the reading of multiple writings as a single contract, including the fact that the instruments are "executed at the same time by the same parties," and whether one contract refers to another and the parties exclusive to the latter). The Card Agreement makes no reference to Sunoco's Rewards Program, and the promotional materials were neither executed at all nor presented contemporaneously with the Card Agreement.

Sunoco's citation to a non-precedential opinion of ours in which we affirmed the District Court's conclusion that contracts which are made for the purposes of a single transaction should be read in reference to each other — aside from being non-binding, see 3d Cir. I.O.P. 5.3 (2015) — is ill-placed because Sunoco acknowledges that here, the promotional materials do not form a contract at all. See Sunoco Br. 20.

[9] There is no conflict between Florida and South Dakota law regarding the parol evidence rule or other applicable principles,

18

of the Card Agreement that would suggest that parol evidence of the promotional materials is admissible to construe the meaning of the Card Agreement's arbitration clause. See, e.g., Pankratz v. Hoff, 806 N.W.2d 231, 236 (S.D. 2011) (noting that absent fraud or mistake, "parol testimony of prior or contemporaneous negotiations . . . which tend to substitute a new and different contract from the one evidenced by the writing, is incompetent" (quoting Neal v. Marrone, 79 S.E.2d 239, 242 (N.C. 1953))); Knabb v. Reconstruction Fin. Corp., 144 Fla. 110, 131–32, 197 So. 707, 715 (1940) ("[W]here the language of a contract is susceptible to more than one construction . . . the court will consider . . . facts and circumstances leading up to and attending its execution . . . . This rule does not apply, however, where the language of the contract leaves no doubt as to the meaning of the parties and in such a case the contract is to be construed without regard to extraneous facts."). There is no evidence of some broader contract between all three entities consisting of both the promotional materials and the Card Agreement. The Card Agreement is an unambiguous and complete contract between White and Citibank; we are aware of no basis for looking outside it to search for a broader "contract" with Sunoco. Because Sunoco has advanced no colorable argument on this front, it cannot compel arbitration.

## B.

Sunoco's final argument is that the Card Agreement's arbitration clause compels White to arbitrate claims against

---

so we need not determine which state's laws apply. See Berg Chilling, 435 F.3d at 462.

"connected" entities, of which Sunoco claims it is one. Sunoco points to the portion of the arbitration clause in the Card Agreement which defines the claims covered as inclusive of those "made by or against anyone connected with us or you or claiming through us or you." J.A. 91. Sunoco argues that it is "connected with" Citibank as it jointly marketed the Sunoco Rewards Card with Citibank.

First, Sunoco's argument fails because it confuses the nature of the claims covered by the arbitration clause with the question of who can compel arbitration. Even if Sunoco is "connected" with Citibank and the claims against Sunoco are covered claims, that does not give Sunoco the right to elect to arbitrate against White. The arbitration clause of the Cardholder Agreement establishes unequivocally that "[e]ither you or we may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between you and us (called 'Claims')." J.A. 91. Moreover, the clause also provides, "At any time you or we may ask an appropriate court to compel arbitration of Claims." Id. The Cardholder Agreement defines "you" as the card holder and "we" and "us" as Citibank. J.A. 88. Nowhere does the agreement provide for a third party, like Sunoco, the ability to elect arbitration or to move to compel arbitration.

Second, we are skeptical of whether the joint marketing campaign between Sunoco and Citibank could make Sunoco a "connected" entity under the arbitration clause.[10] The

_____

[10] Per the choice-of-law clause in the Cardholder Agreement, we use South Dakota law to interpret the express terms of the contract. See Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994) ("Pennsylvania courts generally honor the

20

arbitration clause applies to "Claims made by or against anyone connected with us or you or claiming through us or you, such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy." J.A. 91. Of course, none of these enumerated relationships apply to Sunoco, and Sunoco is not even mentioned in the Cardholder Agreement. Additionally, while the enumerated items are preceded by "such as," the relationships listed evoke far closer connections — ones where rights and obligations are intertwined and where liability may be shared — than the one that Sunoco purports to have with Citibank in this case. The clause read in context suggests that the parties did not intend for it to govern an entity with merely a marketing relationship with Citibank. See, e.g., Opperman v. Heritage Mut. Ins. Co., 566 N.W.2d 487, 490 (S.D. 1997) ("Under the canon of noscitur a sociis, words take import from each other. This maxim of interpretation is 'wisely applied where a word [or phrase] is capable of many meanings in order to avoid the giving of unintended breadth' to contract provisions." (quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961))). Nor does Sunoco advance any rationale for why its marketing agreement with Citibank confers on it a close enough relationship to merit coverage by this clause. In the absence of a rationale or limiting principle for when a relationship between businesses is too tenuous to render them "connected" under this arbitration clause, we cannot hold that White's claims against Sunoco in this case are covered by the arbitration clause.

_____

intent of the contracting parties and enforce choice of law provisions in contracts executed by them.").

21

\* \* \* \* \* \*

The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." Volt Info. Scis., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989). Its "primary purpose" is to ensure that private agreements to arbitrate between parties "are enforced according to their terms." Id. at 479. The Cardholder Agreement is a contract between White and Citibank, and not Sunoco. Without a contractual basis or equitable principles directing us to enforce the agreement in this dispute between White and Sunoco, a third party, we cannot compel arbitration.[11]

V.

For the reasons stated above, we will affirm the District Court's order denying Sunoco's motion to compel arbitration.

---

[11] We also reject Sunoco's argument that the District Court should have conducted a summary trial on the issue of whether Sunoco and Citibank jointly marketed the Sunoco Rewards Card. The District Court acknowledged this issue as a disputed fact and correctly concluded that disposition does not turn on its resolution.

*White v. Sunoco Inc.*
No. 16-2808

ROTH, <u>Circuit Judge</u>, dissenting:

This case involves a single contract about a hybrid product: the Sunoco Rewards Card, a promotional credit card offered jointly by Sunoco and Citibank. As a matter of basic contract law, because White's claims fall squarely within, and arise out of, the broad terms of the integrated contract between White, Sunoco, and Citibank, Sunoco should be able to compel arbitration. Unfortunately, in examining the boundaries of arbitrability, the majority has failed to appreciate precepts of contract law that establish that Sunoco is a party to the single contract at issue here. Accordingly, I respectfully dissent.

I.[1]

As a threshold issue, the promotional materials[2] and the Sunoco Rewards Card Agreement form an integrated

---

[1] I agree with the majority's choice of law analysis and will accordingly apply Florida and South Dakota law.

[2] The majority's characterization of the promotional materials as parol evidence misses the point. Maj. at 17. The promotional materials are not used to interpret an ambiguous term in an otherwise complete contract; rather, the promotional materials are themselves part of the complete Sunoco Rewards Card contract.

contract between White, Citibank and Sunoco.[3] This is clear from the process, outlined in the promotional materials, which, Sunoco asserts, were prepared jointly by Sunoco and Citibank together.[4] To obtain a Sunoco Rewards Card, a consumer first receives the promotional materials, which advertise the fuel discount and include selected terms and conditions, such as procedures for claiming rewards and annual percentage rates for various transactions.[5] The promotional materials explicitly mention that additional terms and conditions will be sent if customers are approved for the card.[6] The promotional pamphlet also includes an application for customers to fill out and return to Citibank. Citibank then processes this application and gathers information about the applicant to verify identity and eligibility for credit. If the application is approved, Citibank sends the applicant a Sunoco Rewards Card, along with the Card Agreement containing additional terms and conditions. Sunoco and Citibank are then responsible for effectuating the discount on Sunoco gasoline purchases, made using the card. Indeed, when White complained to Citibank about discount credits he

---

[3] Whether this is so is a question of law for the courts. *Baker v. Wilburn*, 456 N.W.2d 304, 306 (S.D. 1990) ("The effects and terms of a contract are questions of law to be resolved by the court." (citations omitted)).

[4] Certainly, Sunoco would not have engaged in such a promotion of a Citibank credit card without Citibank's full knowledge and agreement.

[5] JA 44-46, 51-52.

[6] JA 44, 52 ("When you become a cardmember, you will receive the full Sunoco Rewards Card Program Terms and Conditions, which may change at any time for any reason upon thirty (30) days prior written notice.").

did not receive for Sunoco gas purchases, White received credit on his Citibank card,[7] as the discount may be received at the pump or credited to the Citibank billing statement.[8]

Basic contract law dictates that this process cannot create two separate contracts. Promotional materials are generally not considered offers that can be accepted through application, especially when the application is explicitly subject to approval.[9] Here, the promotional materials were clear that mailing in the application would not create a contract, noting that Citibank would have to screen the applicant's creditworthiness. As such, this process cannot create two separate contracts.

Insofar as the majority holds that there is only one valid contract—the Card Agreement between White and Citibank—with terms independent from those specified in the promotional materials,[10] this analysis is not supported by Florida and South Dakota law. Both Florida and South Dakota law allow multiple documents to constitute a single contract. The Florida Supreme Court has held that "a

---

[7] Maj. at 4, fn. 1.

[8] JA 44, 52.

[9] Restatement (Second) of Contracts § 26 (1981) ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.").

[10] Maj. at 16 ("Sunoco has also conceded that there are no terms to 'integrate' with the actual contract at issue: the Card Agreement.").

3

complete contract may be gathered from letters, writings and telegrams between the parties relating to the subject-matter of the contract, and so connected with each other that they may be fairly said to constitute one paper."[11]  Similarly, the South Dakota Supreme Court has held that "a contract may consist of several writings and all writings must be read together to determine the terms of the agreement."[12]  Notably, the writings need not themselves be contracts.[13]

Florida and South Dakota have each articulated standards for construing multiple documents together as one contract.  The Florida Supreme Court will read multiple instruments as one contract where "[t]he instruments in writing which allegedly constitute a valid contract . . . specify

---

[11] *Webster Lumber Co. v. Lincoln*, 115 So. 498, 502 (Fla. 1927) (citations omitted).

[12] *Citibank (S.D.), N.A. v. Hauff*, 668 N.W.2d 528, 534 (S.D. 2003).

[13] While most such cases involve multiple contracts, the South Dakota Supreme Court has construed non-contract writings as part of a contract in at least one case.  In *Citibank (S.D.), N.A. v. Hauff*, the South Dakota Supreme Court held that the expiration language on credit cards were part of Citibank's credit card agreement.  668 N.W.2d at 534.  The language on the credit cards was not a separate contract, but merely a writing indicating when the card would expire.  However, the court held that "the entire agreement between the parties included the language on the card itself." *Id*.  The Florida Supreme Court likewise frequently construes letters or telegrams together to constitute a contract.  *See, e.g.*, *Mehler v. Huston,* 57 So. 2d 836, 837 (Fla. 1952) (collecting cases).

4

the terms and conditions definitely and certainly."[14]   The South Dakota Supreme Court has specified that "[a]ll writings that are executed together as part of a single transaction are to be interpreted together"[15] so that "the intent of the parties will be preserved and enforced."[16]  Writings are more likely to be part of a single transaction when one is dependent upon the execution of the other.[17]

Here, the promotional materials and Card Agreement together state the definite terms of the contract and are clearly part of a single transaction; accordingly, both should be considered together as one contract.  The documents evince the parties' intent for the documents to be read together as one contract.   First, only when read together do the promotional materials and the Card Agreement state the definite terms of the Sunoco Rewards Card.  Without the promotional materials, White would not know what discount he was entitled to through his Sunoco Rewards Card. Without the Card Agreement, White would not know the complete terms and conditions binding the card, including the methods for calculating daily minimums or procedures for addressing discrepancies on a billing statement.

Second, the fact that the promotional materials and Card Agreement are part of a single transaction is shown through the internal references to, and dependence between,

---

[14] *Id.* at 837.
[15] *Baker*, 456 N.W.2d at 306 (citation omitted).
[16] *First Trust & Sav. Bank v. McVeigh*, 211 N.W. 446, 447 (S.D. 1926).
[17] *Kramer v. William F. Murphy Self-Declaration of Trust*, 816 N.W.2d 813, 815 (S.D. 2012).

the documents. The promotional materials clearly refer to the Card Agreement in setting out the entire process which would create the Sunoco Rewards Card Contract.[18] While the Card Agreement does not explicitly mention the promotional materials, the Card Agreement is sent in accordance with the process specified in the promotional materials. Moreover, the documents are dependent on one another: without accepting the subsequent Card Agreement, an applicant would not be entitled to the fuel discount discussed in the promotional materials. Without filling out the application in the promotional materials, applicants would not receive the Card Agreement. Under either Florida or South Dakota law, the promotional materials and Card Agreement accordingly must be read together as an integrated contract between White, Sunoco, and Citibank.

## II.

Following then from the conclusion that there is but one contract here -- the contract between White, Sunoco and Citibank made up of the promotional materials and the Card Agreement – Sunoco, as a party to the contract, is in a position to exercise the provisions of the contract. The plain language of the contract allows Sunoco to compel arbitration of White's claims.

The majority, however, relies on the clause stating that "[e]ither you or we may, without the other's consent, elect mandatory, binding arbitration[,]"[19]—along with the contract's definition of "you" as White and "we" as

---

[18] JA 44, 52.
[19] JA 91.

6

Citibank[20]—to allow only White and Citibank to arbitrate. However, this reading is flawed for two reasons. First, this clause itself is not framed exclusively. Second, the rest of the contract undercuts this interpretation. Following the purportedly limiting clause, the Cardholder Agreement lists as arbitrable any claim which is "[n]ot only ours and yours, but also Claims made by or against anyone connected with us or you or claiming through us or you[.]"[21] The contract further holds that the arbitration clause is explicitly to be interpreted "in the broadest way the law will allow it to be enforced."[22] Thus, the contract, read as a whole, does not restrict the ability to arbitrate to only White and Citibank.

The majority next holds that Sunoco is not sufficiently "connected with" Citibank to render its claims arbitrable. Based on the examples listed in the clause, the majority opines that sufficient relationships are those "where rights and obligations are intertwined and where liability may be shared[;]" relative to such relationships, Sunoco's "merely . . . marketing relationship" with Citibank is insufficient.[23] This is both an overstatement of the necessary relationship and an understatement of the relationship between Sunoco and Citibank. At least some of the examples from the clause, such as an "affiliated company," do not necessarily share obligations or liability. Moreover, Sunoco and Citibank share more than "a marketing relationship." In operating the Rewards Card, Sunoco and Citibank's functions are closely intertwined: Sunoco promulgated some of the terms and

---

[20] JA 88.
[21] JA 91.
[22] JA 91.
[23] Maj. at 19.

7

conditions that govern the use of the Rewards Card and these rewards are, in some cases, credited directly to the statement balance issued by Citibank. Indeed, the card is called the Sunoco Rewards Card. There is no entity more "connected with" Citibank in this endeavor than Sunoco.

While brief excerpts of the Card Agreement can be narrowly read to support the majority's interpretation, when read as a whole the contract clearly evince an intent to allow Sunoco to compel arbitration.

## III.

Finally, even if the plain language of the contract did not allow Sunoco to compel arbitration, Sunoco may do so if "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract."[24] I agree that Florida law would recognize equitable estoppel as a ground for nonsignatories to bind signatories if, in relevant part, "the claim 'arise[s] out of or relate[s] to' the agreement containing the arbitration provision."[25] South Dakota's standard for equitable estoppel is a little different; while not phrased as equitable estoppel, the South Dakota Supreme

---

[24] *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014) (internal quotation marks and citation omitted).

[25] *Rolls-Royce PLC v. Royal Caribbean Cruises LTD.*, 960 So. 2d 768, 771 (Fla. Dist. Ct. App. 2007). As the majority notes, there is a second circumstance in which a nonsignatory can compel arbitration: when a signatory and nonsignatory engage in concerted misconduct. Op. 12-13. I agree with the majority's rejection of this ground, however, as it is clear that this exception is not applicable here.

Court noted that "[i]t would be manifestly unfair to allow [plaintiffs] to assert claims arising out of agreements against nonsignatories to those agreements without allowing those [defendants] [also to] invoke the arbitration clause contained in the agreements."[26] Both standards require that the claim "arise out of" the underlying agreement.

While the majority holds that White's claims do not rely on any terms in the Card Agreement, since the underlying contract encompasses both the promotional materials and the Card Agreement, White's claims clearly do. White's claims arise out of the terms of the fuel discount, which are outlined in the promotional materials. Since the promotional materials are part of the same contract as the arbitration clause, White's claims "arise out of" the underlying agreement, and Sunoco can compel arbitration based on equitable estoppel.

IV.

At issue is an attempt to bypass, through artful pleading, a valid agreement to arbitrate. Clever framing, however, cannot obfuscate the intent of the parties upon creation of the contract. Given that there is an integrated agreement between White, Sunoco, and Citibank, I would hold that, either under the plain terms of the contract or through equitable estoppel, Sunoco can compel arbitration of the claims brought against it. I respectfully dissent.

---

[26] *Rossi*, 648 N.W.2d at 815 (alterations in original) (internal quotation marks and citation omitted).