**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3577
_____

ABDUL A. JALUDI,
Appellant

v.

CITIGROUP and company or one or
more of its direct or indirect subsidiaries
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 3-15-cv-02076
District Judge:  The Honorable Malachy E. Mannion

Argued June 4, 2019

Before: SMITH, *Chief Judge*, JORDAN, and MATEY,
*Circuit Judges*

(Filed: August 6, 2019)

Adam Bluestein                  **[ARGUED]**

Richard H. Frankel
Sydney Melillo                           **[ARGUED]**
Drexel University
Thomas R. Kline School of Law
3320 Market Street
Philadelphia, PA  19104
        *Counsel for Appellant*

Christen L. Casale
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA  19103

Thomas A. Linthorst                      **[ARGUED]**
Morgan Lewis & Bockius
502 Carnegie Center
Princeton, NJ  08540
        *Counsel for Appellee*

Karla Gilbride
Public Justice
1620 L Street, N.W.
Suite 630
Washington, DC  20036
        *Counsel for Amici Appellants*

_____

OPINION OF THE COURT
_____

2

SMITH, *Chief Judge*.

Abdul A. Jaludi, a longtime Citigroup employee, was laid off and terminated in 2013 after reporting certain improprieties in Citigroup's internal complaint monitoring system. Jaludi, believing Citigroup had fired him in retaliation for his reporting, sued Citigroup under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"), and the Sarbanes–Oxley Act of 2002, 18 U.S.C. § 1514A. Citigroup moved to compel arbitration, relying on two Employee Handbooks that contained arbitration agreements. The first of those Handbooks, the 2009 Employee Handbook, contained an arbitration agreement requiring arbitration of all claims arising out of employment—including Sarbanes–Oxley claims.

In July 2010, Congress passed the Dodd–Frank Wall Street Reform and Consumer Protection Act, which amended Sarbanes–Oxley to prohibit pre-dispute agreements to arbitrate whistleblower claims. Pub. L. No. 111-203, § 922, 124 Stat. 1376, 1848 (2010) (codified at 18 U.S.C. § 1514A(e)). In 2011, Citigroup and Jaludi agreed to the 2011 Employee Handbook; the arbitration agreement appended to that Handbook excluded "disputes which by statute are not arbitrable" and deleted Sarbanes–Oxley from the list of arbitrable claims. Suppl. App. 140. Nonetheless, the District Court held that arbitration was required for all of Jaludi's claims.

We disagree. Although Jaludi's RICO claim falls within the scope of either Handbook's arbitration provision, the operative 2011 arbitration agreement supersedes the 2009

3

arbitration agreement and prohibits the arbitration of Sarbanes–Oxley claims. We will therefore affirm in part, reverse in part, and remand for further proceedings.

# I.

## A.[1]

Jaludi began working for Citigroup Technology, Inc. in 1985.[2] Throughout his more than two decades with Citigroup, Jaludi rose steadily through the ranks. Starting as an entry-level tape operator, he eventually became a senior vice president who managed a global team. Jaludi's responsibilities included troubleshooting complaint monitoring systems, merging command centers, and streamlining an application for customer statements.

As part of Jaludi's role, he was responsible for ensuring that problem tickets were created for system- and application-related problems that could affect customers. Jaludi made sure problems were tracked in the complaint management system,

---

[1] Because the District Court compelled arbitration shortly after Jaludi filed his complaint, we derive this background from the allegations in the complaint. No facts material to our decision today are in dispute.

[2] Jaludi's *pro se* complaint named "Citigroup and company or one or more of its direct or indirect subsidiaries." Compl. p. 2, ¶ 2. Jaludi's employer was Citigroup Technology, Inc., a subsidiary of Citigroup, Inc. Like the parties, we refer to the defendant as Citigroup.

resolved, and prevented from recurring. Citigroup was obligated to report severity level one problem tickets to the Office of the Comptroller of the Currency.[3] In early 2010, Jaludi discovered that problem tickets were being mishandled. Jaludi observed that Citigroup was not reporting hundreds of level one tickets; instead, Citigroup was deleting these tickets or reclassifying them to a lower level to avoid reporting obligations. To make matters worse, Citigroup's help desks refused to even open a level one ticket "unless they absolutely had to." Compl. ¶ 12.

Jaludi repeatedly reported these issues to management, escalating his complaints up the chain of command. In early 2010, Jaludi emailed Citigroup's then-CEO, Vikram Pandit, to complain. Shortly thereafter, Jaludi was summoned to meet with Tony DiSanto, the head of the North America Data Center. DiSanto expressed his displeasure with Jaludi's repeated complaints. Citigroup management warned Jaludi to "keep his mouth shut." *Id.* ¶ 17. One of Jaludi's former managers told him that DiSanto "hated [Jaludi's] guts for refusing to keep his mouth shut and wanted him fired." *Id.*

In the second quarter of 2010, Jaludi was demoted. Jaludi's then-supervisor told him that he was more qualified than the person who would be supervising him "but that her hands were tied." *Id.* ¶ 18. Jaludi complained about his demotion. Thereafter, in the third quarter of 2010, Jaludi's

---

[3] These tickets involve problems affecting large dollar amounts or numerous customers. For example, a level one ticket might report a problem that prevents a large number of customers from withdrawing funds or accessing their accounts.

teams were taken away from him. For a period of two months "Jaludi had no staff reporting to him nor was he given any work to do." *Id.* ¶ 21.

Late in the fourth quarter of 2010, Jaludi was transferred from the division where he had worked for twenty-two years. Jaludi's new supervisor had been "told to take Jaludi and did not know what to do with him." *Id.* Two months later, a new manager was added to work between Jaludi and his supervisor. In May 2011, Jaludi was further demoted to an entry-level position.

In the third quarter of 2011, Citigroup held the Citigroup Challenge contest to find the best idea for the future of banking. Jaludi's idea, Family Banking, was selected as the co-winner out of 2,500 ideas from 65,000 participants. Jaludi, along with others, presented the winning idea to the CEO in New York. Shortly afterwards, Jaludi was given an unsatisfactory performance review for failing to meet the company's expectations.

In 2012, one of the judges from the Citigroup Challenge sought Jaludi's assistance in reducing customer problems at one of the bank's command centers. Jaludi reviewed the command center's incident management process and discovered that employees were improperly opening and categorizing trouble tickets. Despite Jaludi's suggestions, the leaders of the command center were not amenable to change. One manager told Jaludi that the command center would not alter its policy because doing so would make metrics look bad and require reporting to federal regulators. In the fourth quarter of 2012, Jaludi told a supervisor about the problem and

6

made suggestions for resolving it. The supervisor ultimately refused to discuss the issue with Jaludi, telling him in December 2012 that he was wasting everyone's time.

On February 20, 2013, Citigroup told Jaludi that he was being laid off "due to deteriorating business conditions and budget constraints." *Id.* ¶ 39. Jaludi complained that his layoff was retaliatory. On April 21, 2013, Jaludi was terminated.[4]

**B.**

Congress enacted Sarbanes–Oxley "[t]o safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation." *Dig. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 773 (2018). Sarbanes–Oxley protects whistleblowers of publicly traded companies. *See* 18 U.S.C. § 1514A(a). Under the Act, companies cannot "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an

---

[4] Jaludi alleges that Citigroup's retaliatory conduct persisted after his termination in that Citigroup employees have prevented him from finding other employment. For example, in November 2014, a retired co-worker told Jaludi that he knew someone at Citigroup who had several job openings. The Citigroup hiring manager—who was unaware of the circumstances surrounding Jaludi's termination—said that he would "see about a position for Jaludi." *Id.* ¶ 48. Then, the retired co-worker told Jaludi that the Citigroup hiring manager was not permitted to consider Jaludi. In all, Jaludi applied for over a dozen positions within Citigroup but never received a response.

7

employee in the terms and conditions of employment" in retaliation for an employee's protected conduct. *Id.* Protected conduct includes providing information to a supervisor "regarding any conduct which the employee reasonably believes constitutes a violation" of certain criminal fraud statutes, U.S. Securities and Exchange Commission rules and regulations, or statutes prohibiting fraud against shareholders. *Id.* § 1514A(a)(1). Prior to Dodd–Frank, employers and employees could agree to arbitrate any future Sarbanes–Oxley claims.

Throughout Jaludi's time at Citigroup, he received many iterations of the company's Employee Handbook, which enumerates its policies and guidelines. In late 2008, Citigroup issued the 2009 Employee Handbook, which Jaludi acknowledged receiving in December 2008. The 2009 Handbook contained an arbitration agreement, which was set forth in an appendix. The 2009 arbitration agreement expressly identifies Sarbanes–Oxley claims as arbitrable disputes and requires their referral to arbitration.

On July 21, 2010, Congress enacted Dodd–Frank. "Passed in the wake of the 2008 financial crisis, Dodd–Frank aimed to promote the financial stability of the United States by improving accountability and transparency in the financial system." *Dig. Realty Tr., Inc.*, 138 S. Ct. at 773 (internal quotation marks omitted). Dodd–Frank amended Sarbanes–Oxley's whistleblower provision to prohibit pre-dispute arbitration agreements. *See* 18 U.S.C. § 1514A(e)(2) (providing that "[n]o predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section").

8

After Dodd–Frank was enacted, Citigroup revised its Employee Handbook. The 2011 Handbook, which Jaludi acknowledged in December 2010, also includes an arbitration agreement, set forth in an appendix, that excludes "disputes which by statute are not arbitrable." Suppl. App. 140. In addition, the 2011 arbitration agreement neither identifies Sarbanes–Oxley claims by name nor mandates, as its predecessor did, the arbitration of such claims. The 2011 Handbook expressly provides that it supersedes any prior, inconsistent policies or Handbooks.

## C.

In October 2015, Jaludi filed a *pro se* complaint in the United States District Court for the Middle District of Pennsylvania asserting claims under RICO and Sarbanes–Oxley. In January 2016, Citigroup moved to compel arbitration of both claims.[5]

In June 2016, the Magistrate Judge to whom the case was referred entered a report and recommendation ("R&R"); the R&R recommended that the District Court compel

---

[5] Shortly after the motion to compel arbitration was fully briefed, Jaludi filed a motion for summary judgment. Citigroup moved to strike the motion for summary judgment, which the Magistrate Judge granted because the motion was premature. Jaludi appealed the Magistrate Judge's order striking his motion for summary judgment. A panel of this Court dismissed that appeal for lack of appellate jurisdiction. Order at 1, *Jaludi v. Citigroup*, No. 16-3167 (3d Cir. Oct. 5, 2016).

9

arbitration of Jaludi's RICO claim but not of his Sarbanes–Oxley claim. The Magistrate Judge believed that the 2011 arbitration agreement did *not* supersede the 2009 arbitration agreement; instead, both policies applied. The Magistrate Judge reasoned that Jaludi's Sarbanes–Oxley claim was not subject to arbitration because it accrued after the effective date of Dodd–Frank. Both parties objected to the R&R.

In August 2016, the District Court sustained Citigroup's objections to the R&R and overruled those of Jaludi. The Court granted the motion to compel arbitration as to both of Jaludi's claims. The District Court found no error in the Magistrate Judge's determination that the 2011 agreement "did not supersede" the 2009 agreement and that, "instead, the Policies are mutually exclusive with [Jaludi's] claims subject to arbitration under either or both." App. 13. The Court concluded that applying Dodd–Frank to Jaludi's Sarbanes–Oxley claim would be impermissibly retroactive.

Jaludi timely appealed.[6] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, and we exercise jurisdiction under 28 U.S.C. § 1291.

---

[6] Initially, Jaludi pursued his appeal *pro se*. In May 2017, a panel of this Court directed the Clerk to appoint *pro bono* counsel for Jaludi. We express our appreciation to *pro bono* counsel for their very able representation of Mr. Jaludi.

## II.[7]

### A.

On appeal, Jaludi challenges only the District Court's decision compelling arbitration of the Sarbanes–Oxley claim. Yet in his *pro se* complaint, Jaludi also pleaded a claim under RICO. Jaludi's RICO claim is subject to arbitration under either the 2009 or 2011 arbitration agreement. *See* Suppl. App. 71 (2009 arbitration agreement, providing that "all disputes arising out of or in any way related to employment" are arbitrable); *see id.* at 140 (2011 arbitration agreement, including "all disputes (other than disputes which by statute are not arbitrable) arising out of or in any way related to employment"). Because Dodd–Frank did not limit Citigroup's authority to enter into a pre-dispute agreement to arbitrate

---

[7] We exercise plenary review over a district court's order on a motion to compel arbitration. *White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017). When reviewing a motion to compel arbitration, we use the standard for summary judgment under Federal Rule of Civil Procedure 56(a) "because the district court's order . . . is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Id.* The district court should only grant a motion to compel arbitration "if there is no genuine dispute as to any material fact and, after viewing facts and drawing inferences in favor of the non-moving party, the party moving to compel is entitled to judgment as a matter of law." *Id.*

RICO claims, we will affirm the District Court's judgment as to the RICO claim.

**B.**

Jaludi's Sarbanes–Oxley claim is a different story. Simply because "the parties have agreed to arbitrate some disputes does not necessarily manifest an intent to arbitrate every dispute that might arise between the parties." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014).

Jaludi contends that the District Court's decision compelling arbitration of the Sarbanes–Oxley claim is incorrect because the 2011 arbitration agreement—the operative contract at the time of Citigroup's allegedly retaliatory acts—precludes arbitration of Sarbanes–Oxley claims. He explains that the 2011 arbitration agreement is contained within the 2011 Employee Handbook, which, by its own terms, supersedes the 2009 Handbook. Jaludi also relies on Pennsylvania law, arguing that a subsequent arbitration agreement supersedes a prior arbitration agreement between the same parties covering the same subject matter. *See Collier v. Nat'l Penn Bank*, 128 A.3d 307, 311 (Pa. Super. Ct. 2015).

For its part, Citigroup contends that the 2009 arbitration agreement applies because it indisputably mandates the arbitration of Sarbanes–Oxley claims. Citigroup attempts to cast the arbitration agreements as separate from the Handbooks to which they are appended, arguing that the 2011 arbitration agreement does not say that it supersedes the 2009 arbitration agreement. According to Citigroup, both the 2009 and 2011 arbitration agreements can remain in effect because they are

12

consistent: "the 2009 Arbitration Agreement requires arbitration of [Sarbanes–Oxley] claims and the 2011 Arbitration Agreement requires arbitration of other claims but does nothing to disturb the obligation in the 2009 Arbitration Agreement." Appellee's Br. 25.

The 2009 and 2011 arbitration agreements are strikingly similar, save for their treatment of Sarbanes–Oxley claims. The 2009 arbitration agreement explicitly includes Sarbanes–Oxley claims:

> The Policy makes arbitration the required and exclusive forum for the resolution of all disputes arising out of or in any way related to employment based on legally protected rights (i.e., statutory, regulatory, contractual, or common-law rights) that may arise between an employee or former employee and Citi . . . *including, without limitation, claims, demands, or actions under . . . the Sarbanes–Oxley Act of 2002, and all amendments thereto*[.]

Suppl. App. 71 (emphasis added). Thus, if the 2009 arbitration agreement applies, a Sarbanes–Oxley claim that arose before Dodd–Frank would be subject to arbitration.

The 2011 arbitration agreement—adopted after Dodd–Frank—eliminates any reference by name to the Sarbanes–Oxley Act:

> The Policy makes arbitration the required and exclusive forum for the resolution of all disputes

13

*(other than disputes which by statute are not arbitrable)* arising out of or in any way related to employment based on legally protected rights (i.e., statutory, regulatory, contractual, or common-law rights) that may arise between an employee or former employee and Citi . . . .

*Id.* at 140 (emphasis added). Citigroup does not dispute that, after Dodd–Frank, Sarbanes–Oxley claims cannot be included in pre-dispute arbitration agreements. Thus, if the 2011 arbitration agreement applies, Jaludi's Sarbanes–Oxley claim is not subject to arbitration.[8]

**1.**

Turning first to the plain language of the 2011 Employee Handbook, we conclude that the 2011 arbitration agreement supersedes the 2009 arbitration agreement. The 2011 Handbook provides:

This Handbook supersedes any Employee Handbooks or Human Resources policies, practices or procedures that may have applied to you and *that are inconsistent with and prior to this Handbook's distribution.*

*Id.* at 96 (emphasis added); *see also id.* at 31 (2009 Handbook, containing almost identical language). The 2011 arbitration

---

[8] As pleaded in his *pro se* complaint, Jaludi's Sarbanes–Oxley claim arises from his termination—which occurred on April 21, 2013, after Dodd–Frank was enacted in July 2010.

14

agreement, which deletes the prior reference to Sarbanes–Oxley claims and excludes claims that are not arbitrable by statute, is patently inconsistent with the prior 2009 agreement, which requires arbitration of Sarbanes–Oxley claims. The 2011 Employee Handbook thus by its plain language supersedes the 2009 Employee Handbook, at least as to the arbitration agreements.[9]

The textual inconsistency between the agreements is not the only reason the 2011 arbitration agreement supersedes the 2009 agreement. After July 2010, arbitration of a Sarbanes–Oxley claim that arose post-Dodd–Frank would violate the law. The 2011 Handbook itself makes clear that when a conflict exists between the Handbook and applicable law, the law prevails. *See id.* at 96 ("[T]he provisions of this Handbook don't supersede any applicable law."). If the same language about the arbitrability of Sarbanes–Oxley claims were contained in the 2011 Handbook as is in the 2009 Handbook, it would violate the law insofar as it would amount to a pre-dispute agreement to arbitrate Sarbanes–Oxley claims that arose after the passage of Dodd–Frank.

Citigroup strains to reach the opposite conclusion—that the 2009 arbitration agreement applies. Citigroup argues that we should consider the arbitration agreements separately from the Handbooks to which they are appended. This argument is

---

[9] This conclusion is reinforced elsewhere in the 2011 Employee Handbook. The 2011 Handbook provides that it does *not* supersede Citigroup's Code of Conduct. Citigroup could have chosen to preserve the 2009 arbitration agreement in a similar manner but declined to do so.

15

unpersuasive because the Handbooks explicitly integrate the arbitration agreements. *See id.* at 31, 96 ("This Handbook contains a policy that requires you to submit employment-related disputes to binding arbitration (see Appendix A)."); *see also Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 443–44, 446–49 (3d Cir. 2003) (holding, under Pennsylvania's Uniform Commercial Code, that an appended arbitration agreement was incorporated by reference into the contract even though one of the contracting parties had never received the appendix).

In a further attempt to convince us that the arbitration agreements are separate from the Handbooks, Citigroup points to the fact that the arbitration agreements have their own procedures for amendment. The 2009 and 2011 Handbooks contain a clause indicating that the arbitration agreements are governed by their own amendment provisions:

> *Except for the Employment Arbitration Policy, which contains its own unique provisions,* to meet the changing needs of both Citi and its employees, Citi reserves the right at any time to create, amend, supplement, modify, or rescind, in whole or in part, any policy, procedure, benefit, or provision of this Handbook, or the Handbook itself, as it deems appropriate, with or without notice.

Suppl. App. 31 (emphasis added); *see also id.* at 96 (2011 Handbook, containing almost identical language). This language does not help Citigroup. That the arbitration agreements contain their own amendment provisions does not

16

mean that the agreements are separate from the Handbooks in which they are contained.

Moreover, the only amendment provision unique to the arbitration agreements is a thirty-day grace period before any amendments take effect:

> Citi reserves the right to revise, amend, modify, or discontinue the Policy at any time in its sole discretion with 30 [calendar] days' written notice. Such amendments may be made by publishing them in the Handbook or by separate release to employees and shall be effective 30 calendar days after such amendments are provided to employees and will apply prospectively only. *Your continuation of employment after receiving such amendments shall be deemed acceptance of the amended terms.*

*Id.* at 75, 144 (alteration in 2011 policy only). In other words, an amendment to the Employee Handbook goes into effect immediately, whereas an amendment to the arbitration agreement goes into effect after thirty days.

We fail to see how this difference helps Citigroup, which indisputably followed the thirty-day amendment procedure here. Citigroup published the 2011 arbitration agreement in the 2011 Handbook with instructions for employees to sign or acknowledge the Handbook within thirty days. Jaludi dutifully did so; his continued employment was dependent upon acceptance of the revised terms. Amendments

17

to the arbitration agreement were prospective only, and Jaludi was fired in April 2013—over two years after he acknowledged the 2011 Handbook.

In short, Citigroup's assertion that the 2009 and 2011 arbitration agreements were meant to exist alongside one another strains credulity. We conclude that the 2011 arbitration agreement superseded the 2009 arbitration agreement and thus applies to this dispute.

**2.**

Our conclusion that the 2011 Employee Handbook, by its own terms, supersedes the 2009 Handbook is supported by both federal and state law. But the parties disagree as to what body of law applies. Citigroup urges us to apply federal law—particularly the presumption of arbitrability—in an attempt to override the plain language of the Handbooks. According to Jaludi, we should apply Pennsylvania law.

We agree with Jaludi that state law applies. Deciding whether arbitration is required is a two-step process: in the first step, the court determines whether "there is an agreement to arbitrate," and then in the second step, the court decides whether "the dispute at issue falls within the scope of that agreement." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009). The first step is governed by state law. *Id.* at 524.

The dispute here—whether Jaludi and Citigroup agreed to arbitrate Sarbanes–Oxley claims—centers on the first step. *See id.* at 523; *see also First Options of Chi. v. Kaplan*, 514

18

U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). We thus apply "ordinary state-law principles that govern the formation of contracts" to determine whether the subsequent arbitration agreement supersedes a prior agreement. *Century Indem. Co.*, 584 F.3d at 524 (quoting *First Options*, 514 U.S. at 944); *see, e.g.*, *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1122 (11th Cir. 2014); *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011). In applying state law at step one, we do *not* invoke the presumption of arbitrability. *See Century Indem. Co.*, 584 F.3d at 526–27; *see also Dasher*, 745 F.3d at 1122; *Applied Energetics, Inc.*, 645 F.3d at 526. At step two, however, "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement . . . due regard must be given to the federal policy favoring arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 475 (1989).

The presumption of arbitrability enters at the second step—it applies to disputes about the scope of an existing arbitration clause. *Century Indem. Co.*, 584 F.3d at 526–27; *see White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017) ("[T]he presumption of arbitrability applies only where an arbitration agreement is ambiguous about whether it covers the dispute at hand. Otherwise, the plain language of the contract holds."). Here, the parties agree about the scope of the arbitration agreements—Jaludi is required to arbitrate his Sarbanes–Oxley claim under the 2009 arbitration agreement, but not under the 2011 agreement. Applying the presumption

19

would thus put the cart before the horse.  *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010) ("We have applied the presumption favoring arbitration . . . only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and . . . is . . . best construed to encompass the dispute.").

Citigroup relies heavily on *First Liberty Investment Group v. Nicholsberg*, in which we quoted the Fourth Circuit's statement that "[w]hen a party seeking to avoid arbitration contends that the clause providing for arbitration has been superseded by some other agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication."  145 F.3d 647, 650 (3d Cir. 1998) (quoting *Zandford v. Prudential-Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir. 1997)).  Although this language at first blush seems to cut in Citigroup's favor, it ultimately does not.  In *Nicholsberg*, we did not need to decide whether a later agreement superseded an earlier one because, in that case, *both* agreements obligated the parties to arbitrate their dispute.  *See id.* at 649–50.  Accordingly, because there was an agreement to arbitrate, the presumption in favor of arbitrability applied only to determine whether the dispute at hand fell within the scope of that agreement to arbitrate.  *See id.* at 653.  To the extent Citigroup's preferred language from *Nicholsberg* could apply in a case such as this one, in which the existence of an agreement to arbitrate the dispute at hand depends on whether the later agreement superseded the prior agreement, that language is merely dicta.  Further, our post-*Nicholsberg*

20

precedent has made clear that we apply state law when determining whether there is an agreement to arbitrate. *See Century Indem. Co.*, 584 F.3d at 523–24. We continue to do so here.

Although our holding is merely an application of our prior precedent, *see id.* at 523, we make clear today that the question of whether a later agreement supersedes a prior arbitration agreement is tantamount to whether there is an agreement to arbitrate. It is therefore a question to which state law, not federal law, applies. *Accord Dasher*, 745 F.3d at 1115–16 (applying state law to determine whether a later arbitration agreement superseded an earlier one because the dispute was about whether a contract had been made, not about scope); *Applied Energetics, Inc.*, 645 F.3d at 526 (same).

Under Pennsylvania law,[10] the later of two agreements between the same parties as to the same subject matter generally supersedes the prior agreement. *See, e.g.*, *In re Klugh's Estate*, 66 A.2d 822, 825 (Pa. 1949) (holding that the appellant had abandoned an option contained in the first lease

_____

[10] Although Citigroup contends that federal law applies, it does not dispute that, if we were to apply state law, the law of Pennsylvania is applicable. *Cf. Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 533 (3d Cir. 2009) ("Though neither party explicitly states that Pennsylvania law applies to the question whether there is a valid arbitration agreement, they seem to agree that Pennsylvania law does apply, because, apart from federal cases, each predominantly cites Pennsylvania state court cases on the issues in this case.").

21

by agreeing to three subsequent leases that lacked an option). This is true even if the first agreement includes an arbitration clause and the second agreement does not. *See Collier*, 128 A.3d at 311.

In *Collier*, a customer sued a bank for improperly assessing overdraft fees. *Id.* at 308. The bank attempted to compel arbitration. *Id.* at 309. The trial court denied the bank's petition to compel arbitration, holding that the later 2010 Account Agreement controlled, rather than the 2008 Account Agreement. *Id.* at 309–11. The Superior Court of Pennsylvania affirmed, explaining that the 2010 Agreement had superseded the 2008 Agreement. *Id.* at 311. Unlike the 2008 Agreement, the 2010 Agreement did not contain an arbitration clause; instead, the 2010 Agreement provided that disputes would be resolved either by the bank or through litigation. *Id.* The Superior Court reasoned that the 2010 Agreement "addresses the same subject matter as the 2008 Agreement and is similarly comprehensive in its terms." *Id.* As such, the parties intended the 2010 Agreement to supersede the 2008 Agreement, "certainly with regard to judicial resolution of disputes in lieu of arbitration." *Id.* The parties therefore had no agreement to arbitrate. *Id.*

So too here. Reading the arbitration agreements in their entirety, the only reasonable conclusion is that Citigroup intended the 2011 arbitration agreement to supersede the 2009 arbitration agreement. The 2011 arbitration agreement largely tracks the 2009 arbitration agreement—except as to Sarbanes–Oxley claims. As discussed *supra*, the 2011 arbitration agreement removes its predecessor's reference to Sarbanes–Oxley claims and prohibits arbitration of claims that are not

22

arbitrable by statute; after July 2010, this prohibition included Sarbanes–Oxley claims. *See Applied Energetics, Inc.*, 645 F.3d at 525 (holding that a later agreement that is silent on arbitration supersedes an earlier agreement providing for arbitration because "[b]oth provisions are all-inclusive, both are mandatory, and neither admits the possibility of the other"). We therefore hold that the 2011 arbitration agreement supersedes the 2009 agreement, that the 2011 agreement excludes Sarbanes–Oxley claims, and that the District Court thus erred by compelling arbitration of Jaludi's Sarbanes–Oxley claim.[11]

## III.

The 2011 arbitration agreement, which excludes Sarbanes–Oxley claims, applies to Jaludi's claims and supersedes the 2009 arbitration agreement. The District Court erred in compelling arbitration of Jaludi's Sarbanes–Oxley

[11] Citigroup also contends that we should uphold the decision compelling arbitration so that an arbitrator may decide questions of arbitrability. In its reply brief in the District Court, Citigroup first invoked a provision in the 2011 and 2009 arbitration agreements requiring an arbitrator to decide arbitrability. Even on appeal, Citigroup concedes "that the District Court was authorized to decide the questions of the arbitrability of the RICO and [Sarbanes–Oxley] claims, and that this Court may decide whether the District Court erred in compelling Jaludi's claims to arbitration." Appellee's Br. 43. Because Citigroup failed to invoke the provision until its reply brief in the District Court, we deem this argument waived.

claim.  We will therefore affirm in part, reverse in part, and remand for further proceedings.